[Cite as *Intergroup Internatl. Ltd. v. Cincinnati Ins. Cos.*, 2017-Ohio-8660.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No.    105290

# INTERGROUP INTERNATIONAL LTD.

PLAINTIFF-APPELLANT

vs.

# CINCINNATI INSURANCE COMPANIES

DEFENDANT-APPELLEE

## JUDGMENT
AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-15-848369

**BEFORE:**    Boyle, J., E.A. Gallagher, P.J., and McCormack, J.

**RELEASED AND JOURNALIZED:**    November 22, 2017

**ATTORNEY FOR APPELLANT**

David J. Horvath
7100 E. Pleasant Valley Road, Suite 110
Independence, Ohio    44131


**ATTORNEY FOR APPELLEE**

Patrick S. Corrigan
55 Public Square, Suite 930
Cleveland, Ohio    44113

MARY J. BOYLE, J.:

{¶1} Plaintiff-appellant, Intergroup International Ltd. ("Intergroup"), timely appeals from an order of the trial court that denied its motion for summary judgment and granted summary judgment in favor of defendant-appellee Cincinnati Insurance Companies ("Cincinnati") on Intergroup's complaint and Cincinnati's counterclaims for declaratory judgment. After careful review of the record, we find that summary judgment in favor of Cincinnati on Intergroup's claims related to the 2014 insurance claim was proper, but further find that summary judgment was improper on its 2015 claims and Cincinnati's counterclaims. Accordingly, we affirm in part and reverse in part.

## I. Facts Underlying the Parties' Claims

{¶2} This case arises from an insurance claim dispute between Intergroup and Cincinnati and pertains specifically to Cincinnati's denial of insurance coverage on two incidents of property damage to the roof structure of Intergroup's warehouse facility located at 14500 Darley Avenue, Cleveland, Ohio (the "Darley building" or the "property"). The relevant facts are taken from the evidentiary documents and transcripts of depositions filed with the parties' motions for summary judgment.

### A. Purchase, Repairs, and Initial Inspection

{¶3} Intergroup purchased the Darley building in 2011. In conjunction with the purchase, Intergroup hired Kane Construction to inspect the roof, its supporting members, and to make any and all necessary repairs. Mike Kane, the owner of Kane

Construction, repaired leaks to the roof, and "re-engineered" and replaced a roof truss that was "sagging." Kane further reported that a few of the trusses appeared to have "slight discoloration" from leaks throughout the years because the building was nearly 100 years old. Otherwise, Kane did not "see the need to replace any of the trusses because of any noticeable deterioration" other than the truss that he "re-engineered" and replaced.

{¶4} Subsequently, Intergroup contracted with Cincinnati to provide commercial insurance coverage on the property. In April 2012, as part of the insurance underwriting process, Cincinnati sent loss control field director, Leo Kline, to the Darley building to inspect the premises and note the physical conditions of the property. In his report, Kline noted that the roof had been repaired in 2011-2012, with "only minor repairs needed" and that the roof was in satisfactory condition at the time of the inspection. Kline did not make any recommendations for repairs to the property at that time.

**B. The June 2, 2014 Event and Claim Denial**

{¶5} Over two years later, on the morning of June 2, 2014, Intergroup employees arrived to the Darley building to discover that a truss holding up the roof had undergone movement and was sagging in place. Intergroup immediately attempted to stabilize the sagging truss by engineering a metal support beam to hold it up. Subsequently, Intergroup contacted Cincinnati to report the failed truss and file a claim for insurance coverage.

{¶6} In response to the claim, Cincinnati sent a claims representative, Lee Hatch, to inspect the affected area of the property and take pictures. When Hatch viewed the failed truss from the ground, he saw peeling paint and discolored and splintered wood. This led him to believe that there could be an issue with the wood that caused the trusses to move. Hatch reported his observations to his field claims manager, Jeff Shive, and further recommended that Cincinnati employ an expert to view the damaged truss and give an opinion on the cause of damage. Cincinnati contacted Rudick Forensic Engineering to investigate. Rudick dispatched engineer Eric Hauser, a senior forensic engineer, to the site.

{¶7} Hauser inspected the damaged property on June 11, 2014, and issued his findings in an inspection report. In his report, Hauser stated that two trusses had experienced "differential movement," and Intergroup had installed a steel post "below the south-most of the two compromised trusses." He noted that workers informed him of a storm that occurred the night before and said that when they arrived in the morning they saw the sagging trusses and water leaking down through the roof directly above the damaged areas.

{¶8} When describing the roof's surface upon inspection, Hauser reported the presence of "a large area of ponded water" on the roof directly above the damaged trusses. Specifically, he noted that "[t]he severity of staining of the membrane surfaces both below and adjacent to the accumulated water indicated this condition had been present over an extended period of time prior to the reported discovery of leaks during

the previous week." He also noted that there were numerous and apparently old cracks in the roof membrane that might have allowed water to seep into the interior of the building and damage the structures.

{¶9} Hauser reported that a close range inspection of the failed trusses revealed that the presence of varying degrees of rot and decay within the "truss chords" caused the movement of the trusses and that "[m]inimal resistance was afforded during insertion of the point of a scratch awl into the interior of the more severely deteriorated sections." Lastly, he noted that "[i]t was readily apparent that exposure to moisture over an extended period of time had eventually compromised the integrity of the support structure such that it was unable to support normal roof loadings."

{¶10} On June 27, 2014, Cincinnati denied Intergroup's claim for insurance coverage. In a letter written by Hatch to Neil Gloger, Intergroup's chief executive officer, Hatch explained that the claim was denied because:

> Mr. Hauser's conclusion is that the damage to the roof truss was not storm
> related but due to varying degrees of rot and decay within portions of the
> top chords, diagonals, and vertical truss members. This occurrence is
> unfortunately not a direct physical loss to your property and after a review
> of your policy it does not appear that we will be able to provide coverage
> for your loss.

{¶11} Hatch further included in the letter the section of the policy that he felt was relevant to the denial of the claim which was:

SECTION A. COVERAGE

We will pay for direct physical "loss" to Covered Property at the "premises" caused by or resulting from any Cause of Loss.

1. Covered Property

Covered Property, as used in this Coverage Part, means the following types of property for which a Limit of Insurance is shown in the Declarations:

a. Building

Building, means the building or structure described in the Declarations, including:

(1) Completed additions;

(2) Fixtures, including outdoor fixtures;

(3) Permanently installed [items]:

* * *

(5) If not covered by other insurance:

(a) Additions under construction, alterations and repairs to a covered building;

(b) Materials, equipment, supplies and temporary structures, on or within 1,000 feet of the "premises," used for making additions, alterations or repairs to a covered building.

b. Exclusions

We will not pay for "loss" caused directly or indirectly by any of the following, unless otherwise provided. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss."

(d) Miscellaneous Causes of Loss

1) Wear and tear;

2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself[.]

{¶12} Gloger challenged the denial of the claim on the grounds that the insurance policy had a rider on page 19 that covered a "collapse" where rot and decay was hidden from view and was not reasonably discoverable. According to Gloger, no one at the facility had noticed the presence of rot or decay until the truss failed and exposed splintered wood.

{¶13} Cincinnati reviewed the rider to the policy and in a letter written by Hatch to Gloger dated September 14, 2014, Cincinnati once again denied Intergroup coverage of the claim, this time stating:

We have reviewed the policy again, in particular Section A.5.c., Collapse (2)(b). I have included this section of your policy below.

c. Collapse

(1) With respect to buildings:

(a) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

(b) A building or any part of a building that is in imminent danger of collapse is not considered to be in a state of collapse.

(c) A building that is standing or any part of a building that is standing is not considered to be in state of collapse even if it:

1) Has separated from another part of a building; or

2) Shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinking or expanding.

(2) We will pay for "loss" to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Part, if the collapse is caused by one or more of the following:

(b) Decay that is hidden from view, unless the presence of such decay is known or should reasonably have been known to an insured prior to collapse;

We feel that the presence of the decay was an open and obvious condition that occurred over a period of time and the decay was not caused by direct physical damage.

{¶14} Subsequently, an agent of Intergroup contacted Hatch by email and asked Hatch to reconsider Cincinnati's decision on the denial of the claim. After discussing the matter with his supervisor, Hatch notified Intergroup that the policy did not cover the loss because the failure of the trusses did not constitute a collapse within the meaning of the Section c.(1)(a)-(c) of the policy rider covering collapse because the truss was sagging in place and had not yet fallen.

## C. The June 16, 2015 Event and Claim Denial

{¶15} On the morning of June 16, 2015, Intergroup employees arrived to the Darley building to discover that a large portion of the property's roof (approximately 4,000 square feet) had collapsed inward onto the interior floor of the building.

{¶16} On June 19, 2015, Intergroup filed an insurance claim with Cincinnati asking that it cover the 2015 partial collapse of the roof. Cincinnati sent its field claims supervisor, Jeff Shive, to observe the loss and once again contracted with Rudick Forensic Engineering to inspect the property and determine the cause of the 2015

collapse. On June 25, 2015, Rudick dispatched Hauser to investigate on behalf of Cincinnati.

{¶17} Hauser noted his observations and opinions regarding the loss in a formal inspection report dated August 24, 2015. Hauser reported that when he arrived to the property, Intergroup employees had moved most of the collapsed structure from where it had fallen to a different location. According to Hauser, the removal of the collapsed roof structure precluded a definitive determination of the location where the collapse originated. Nonetheless, Hauser concluded that the collapsed roof was "in the general area where the trusses had sustained movement in the previous year."

{¶18} Hauser further noted that inspection of the removed roof fragments showed similar rot and decay that had been present during his inspection of the trusses in 2014. He also stated that it was evident that "some members" of the roof structure "integral to the support of the roof had been severely compromised by exposure to moisture over an extended period of time" and that an inspection of the exposed wood framing the edge of the roof opening showed that some of the wood was also compromised by rot and decay. Similar to his 2014 report, Hauser concluded that "[i]t was evident that surface runoff had penetrated through openings in the roof membrane, resulting in leaks that may or may not have materialized in damage to the interior," and that the rot present had developed from exposure to moisture over an extended period of time.

{¶19} After receiving Hauser's report, Cincinnati denied Intergroup's 2015 claim on the partial roof collapse. In a letter dated October 28, 2015, sent by Cincinnati's

field claims superintendent, Tom Ruth, to Gloger, Cincinnati denied coverage of the claim on the basis that the presence of decay in the Darley building's roof was something that Intergroup either knew about, or reasonably should have known about, prior to the roof's partial collapse on June 16, 2015. More specifically, Cincinnati stated that Intergroup was put on notice of the decay from (1) the June 2, 2014 truss failure, (2) the fact that it had done some work in this area of the roof after the truss failure, and (3) the fact that the 2015 collapse occurred in the same general area of the 2014 truss failure. Accordingly, Cincinnati declared that the insurance policy and rider covering collapse did not apply to cover the claimed losses.

## II. Procedural History

### A. Intergroup's Complaint

{¶20} On July 16, 2015, Intergroup filed a complaint with a jury demand against Cincinnati for breach of contract, bad faith, and declaratory relief related to Cincinnati's denial of its claims for insurance coverage for the June 2, 2014 and June 16, 2015 incidents at the Darley building.

{¶21} As stated in the complaint, the alleged facts giving rise to the breach of contract claims were that Intergroup contracted with Cincinnati to provide insurance coverage to the Darley building that, according to Intergroup, should have covered both the 2014 and 2015 damage incidents. Specifically, Intergroup alleged that a violent thunderstorm occurred on June 2, 2014, which caused a portion of the roof and related structure to "collapse" because of an onslaught of water and wind.

**{¶22}** According to the allegations in Intergroup's complaint, this collapse was specifically covered under a rider to its general policy that stated that Cincinnati would "pay for a loss to covered property, caused by collapse of a building or any part of a building insured under this coverage part, if the collapse is caused by * * * [d]ecay that is hidden from view[.]"

**{¶23}** The complaint further alleged that at no time did any officer, employee, or agent of Intergroup ever notice decay to the roof and that the expert report issued by Rudick Forensic Engineering pertaining to the 2014 event was inconclusive about the cause of loss and in many ways confirmed that there was no apparent or visible rot in the roof structure. Accordingly, Intergroup maintained that Cincinnati wrongly denied the 2014 claim.

**{¶24}** Intergroup goes on to allege in its complaint that the 2015 partial collapse was the "direct and proximate result of Cincinnati's failure to provide coverage so that the 2014 damage could be properly fixed." The complaint asserts that following the 2014 event, Intergroup "did everything else it could reasonably and financially do to prevent further damage to the roof," by placing a steel pole under the failing truss. The complaint further alleges "[t]hat the removal of the new [2015] damage clearly shows there [was] no visible rot in any of the roof trusses nor could there have been any visible rotting in the truss that was the subject of the previous claim."

**{¶25}** Intergroup alleged that Cincinnati had a contractual duty to pay for the damages it sustained as a result of the 2014 collapse and should have paid for such

damages back in 2014. Intergroup further alleged that Cincinnati was also responsible for damages sustained to the property as a result of the 2015 collapse.

{¶26} Intergroup's bad faith claim denial asserted that Cincinnati wrongly relied on an inconclusive report by Rudick Forensic Engineering when denying the claims and thus violated its duty of loyalty and fair dealing to Intergroup.

{¶27} In Intergroup's third cause of action for declaratory relief, Intergroup asked the court to declare that the rider pertaining to building "collapse" found on page 19 of the insurance policy provides coverage for Intergroup's 2014 and 2015 losses and supersedes the basic provisions of the general policy.

**B. Cincinnati's Answer, Counterclaims, and Request for        Bifurcation**

{¶28} In its answer, Cincinnati generally denied the allegations in the complaint and asserted several affirmative defenses, including the fact that Intergroup's claims for breach of contract and bad faith denial could not apply to the 2015 event because Cincinnati was still reviewing the merits of the claim and had not yet denied coverage.

{¶29} Cincinnati also asserted a counterclaim for declaratory judgment asking that the court declare there was obvious and apparent rot and decay in the weight-bearing trusses of the roof structure that pre-existed the June 2014 claim and that Intergroup took no effective steps to remedy these conditions, and further, that this failure of maintenance was not a covered loss with respect to the June 2014 and 2015 claims.

{¶30} After filing its answer and counterclaim, Cincinnati requested bifurcation of Intergroup's bad faith claim pending resolution of its breach of contract and declaratory judgment claims. The court granted bifurcation and discovery commenced.

**C. Motions for Summary Judgment**

{¶31} On October 14, 2016, Intergroup and Cincinnati filed motions for summary judgment. In its motion for summary judgment, Intergroup argued that the 2014 and 2015 loss events were separate and distinct from each other, based on two separate weather-related events, or in the alternative, based on hidden rot and decay. Intergroup further alleged that Cincinnati improperly denied both claims in breach of its contractual obligations to cover such losses. Intergroup asked that the court find in its favor on the breach of contract and declaratory relief claims, preserving for trial its bad faith claim.

{¶32} Conversely, Cincinnati asked for summary judgment in its favor on all claims and counterclaims, including Intergroup's bad faith claim. In its motion for summary judgment, Cincinnati primarily argued that the 2014 event was not a covered loss because it did not meet the definition of "collapse" within the terms of the policy and that the lack of maintenance to the failed 2014 trusses, which were clearly rotted and in need of repair, contributed to the 2015 partial roof collapse. Cincinnati further argued that there was clear visible rot and decay within the roof and truss structures that were the subject of the 2015 collapse.

{¶33} In support of its argument Cincinnati attached the 2014 and 2015 inspection reports by Hauser, as well as a newly executed affidavit signed by Hauser on

October 13, 2016.  In his affidavit, Hauser stated in relevant part at paragraphs 10 and

11:

> 10. It is my opinion within a reasonable degree of engineering certainty that partial shifting of the truss involved in the June, 2014 claim was as a direct result of deterioration, rot, and failed maintenance of the structure and that the deterioration would have been visible for many months prior to the time of the failure of the truss.
>
> 11. It is my further opinion, within a reasonable degree of engineering certainty, that partial collapse that occurred in June, 2015 is attributable to the incidence of rot and decay within the trusses that supported the roof.

**{¶34}** Accordingly, based on this evidence and other evidence included in its motion for summary judgment, Cincinnati maintained that no provision in the insurance policy covered the resulting 2014 and 2015 losses.

### D. Intergroup's Motion to Strike

**{¶35}** On October 25, 2016, Intergroup filed a motion to strike the Hauser affidavit.  In this motion, Intergroup argued that Hauser's affidavit violated the procedural protections of Loc.R. 21.1 of the Court of Common Pleas of Cuyahoga County, General Division, that mandates all expert reports be exchanged between parties 30 days before trial and precludes an expert from testifying at trial in any manner inconsistent with a previous report.  Intergroup maintained that competing motions for summary judgment are in essence a "trial" on the merits of the action and, therefore, all expert testimony must comply with Loc.R. 21.1.

**{¶36}** Intergroup further argued that Hauser's declarations as to the cause of the 2014 and 2015 events and the purportedly open and obvious nature of the rot and decay

in the 2014 failed truss were both untimely and inconsistent with his previous expert inspection reports.   Accordingly, Intergroup asked that the court strike the affidavit from the record.

**E. The Trial Court's Decision**

**{¶37}** In December 2016, the trial court denied Intergroup's motion to strike and found in favor of Cincinnati on its motion for summary judgment, stating:

> Plaintiff's motion for summary judgment filed * * * 10/14/2016 is denied. Defendant's cross-motion for summary judgment filed, 10/14/2016, is granted. This court finds that the subject policy, general liability policy no. epp 008 30 32, does not provide coverage for the Plaintiff's losses on June 2, 2014 and June 16, 2015.   Therefore judgment is granted in favor of Defendant on all counts of Plaintiff's complaint and Defendant's counterclaim.

**F. Appeal and Assignments of Error**

**{¶38}** The soundness of the trial court's decision is now the subject of the present appeal.   Intergroup raises two assignments of error for our review:

> 1. The trial court erred by finding the Cincinnati Policy did not provide coverage for Appellant's losses, improperly resolved questions of fact in the Defendant's favor and therefore improperly granted summary judgment.
>
> 2. The trial court erred by refusing to strike from the record the supplemental affidavit of Eric Hauser P.E. pursuant to Appellant's Motion to exclude same under Local Rule 21.1, and improperly considered all reports and opinions.

## III.   Standard of Review

**{¶39}** We review a trial court's grant of summary judgment de novo.   *Bonacorsi v. Wheeling & Lake Erie Ry. Co.*, 95 Ohio St.3d 314, 2002-Ohio-2220, 767 N.E.2d 707,

¶ 24.   Pursuant to this standard, summary judgment is appropriate only when the moving party demonstrates that (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) when construing the evidence most strongly in favor of the nonmoving party, reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made.   Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183, 677 N.E.2d 343 (1997).

{¶40} Further, appellate courts review a trial court's decision to grant or deny a motion to strike for an abuse of discretion.   *State ex rel. Cty. of Cuyahoga v. Jones Lang Lasalle Great Lakes Corporate Real Estate, L.L.C.*, 8th Dist. Cuyahoga No. 104157, 2017-Ohio-4066, ¶ 93.

## IV. Analysis

### A. Grant of Summary Judgment

{¶41} At the time of summary judgment, Intergroup's claim for breach of contract pertaining to the 2014 claim denial involved factual allegations that gave rise to two discernable theories that would have entitled it to relief if proven.   In essence, these two theories were that Cincinnati breached the insurance agreement with Intergroup by failing to cover the 2014 loss event, which was either (1) a loss event caused by extreme, sudden weather conditions or (2) a "collapse" that resulted from hidden rot and decay. To support its second theory, Intergroup's third claim for declaratory relief asked the court to declare that the 2014 event fell under the definition of "collapse" pursuant to the

rider provisions included within the policy at page 19, which would cover losses resulting from certain instances of collapse.

{¶42} Further, Intergroup raised several discernable theories for its breach of contract claim on the 2015 claim denial. These were that (1) Cincinnati's failure to pay for the 2014 loss resulted in Intergroup not being able to make the necessary repairs to the structure that directly and proximately resulted in the 2015 partial roof collapse; (2) the failed maintenance to the 2014 event caused the 2015 collapse; and (3) the 2014 and 2015 events were independent of each other and that any rot or decay present in the section of the roof compromised by the 2015 collapse was hidden from view.

### 1. 2014 Breach of Contract and Declaratory Judgment Claims

{¶43} Summary judgment in favor of Cincinnati on Intergroup's breach of contract and declaratory judgment claims involving the 2014 insurance claim denial was correct because there are no genuine issues of material fact regarding these claims.

{¶44} The general insurance policy at issue in this case at page nine makes clear that Cincinnati will pay for loss caused by weather conditions only if those weather conditions result in a covered loss independent of certain other causes of loss found in Section A Coverage, 3. Covered Causes of Loss, b. Exclusions. One exclusion found in this section is an exclusion for loss caused by "fungi, wet rot, dry rot, or bacteria." Under the general policy provisions, it does not matter if the "fungi, wet rot, dry rot, or bacteria" is hidden from view prior to causing or contributing to the loss — any rot, whether seen or unseen, results in exclusion from coverage.

**{¶45}** At summary judgment, the only evidence Intergroup used to support its theory that a severe storm caused the 2014 property damage was an unauthenticated internet printout of a weather report. Intergroup failed to submit any expert report or testimony that would explain how the storm was causally connected to the resulting loss. By failing to authenticate the document and include an expert report on the issue of causation, Intergroup offers the court nothing more than its own assertions that the storm caused the loss. At summary judgment, a plaintiff is required to do more than rest on the bare assertions provided in the complaint, which is what Intergroup attempts to do here. *Sutliff v. Cleveland Clinic Found.*, 8th Dist. Cuyahoga No. 91337, 2009-Ohio-352, ¶ 33 (a party cannot rest on bare allegations at summary judgment); *Deutsche Bank Natl. Trust Co. v. Najar*, 8th Dist. Cuyahoga No. 98502, 2013-Ohio-1657, ¶ 34 (documents that are unsworn, unauthenticated, or uncertified are not to be considered in a motion for summary judgment).

**{¶46}** Intergroup's bare assertions do not create a genuine issue of material fact in light of other credible evidence in the record that shows a storm did not cause the 2014 damage to the property. Specifically, both Intergroup and Cincinnati attached the 2014 Hauser inspection report to their respective motions for summary judgment. Intergroup did not object to Hauser's classification as an expert in this matter nor did it present any evidence that would counter Hauser's expert opinion that "[t]here were no patterns of damaged or torn portions [of the roof] that would suggest the roof system had been

compromised by exposure to damaging wind levels." Accordingly, the Hauser report is direct and credible evidence that a storm did not cause the resulting loss.

{¶47} Moreover, even if we were to assume that a storm might have causally contributed to the damage, it is clear from the evidence in the record that the storm was not the only causal factor and that the presence of rot and decay in the trusses also contributed to the loss. Hauser's inspection report indicates that rot and decay caused by repeated exposure to moisture over time compromised the truss structure and caused the truss to fail.

{¶48} In its motion for summary judgment and brief on appeal, Intergroup does not deny the presence of rot and decay but only argues that the conditions were not apparent prior to the structural failure. Under the general terms of the insurance policy, however, it does not matter that the rot and decay might have been hidden from view; it is sufficient for Cincinnati to deny the claim based on rot being a causal factor alone. Intergroup offers no expert report to counter the conclusions in Hauser's inspection and, therefore, Intergroup fails to raise a genuine issue of material fact on the cause of the truss failure.

{¶49} Further, Intergroup's declaratory judgment claim, which asks the court to declare that the 2014 event is covered under the general policy's rider provisions related to collapse, was properly resolved in favor of Cincinnati, and thus does nothing to revive the breach of contract claim. Under the facts of this case, the rider provisions contained on page 19 of the insurance policy would only provide coverage for the 2014 loss if there

was a collapse and the collapse resulted from decay that was hidden and could not have been reasonably known to exist by the insured prior to the collapse. The problem here is that the 2014 truss failure was not a collapse. The rider provisions carefully delineate what is and is not considered a "collapse" and in doing so explicitly state at subsections (1)(b) and (c) that

> (b) A building or any part of a building that is in imminent danger of collapse is not considered to be in a state of collapse.

> (c) A building that is standing or any part of a building that is standing is not considered to be in state of collapse even if it:

>> 1) Has separated from another part of a building; or

>> 2) Shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinking or expanding.

{¶50} The facts in this dispute are clear that the 2014 truss failure resulted in a sagging truss that was detaching from the roof structure. Although the roof may have been in danger of collapsing, the event had not occurred and Intergroup's tenuous arguments to the contrary are not well taken.

{¶51} Accordingly, the trial court did not err by finding in favor of Cincinnati on Intergroup's claims for breach of contract, bad faith denial, and declaratory judgment related to the 2014 claim denial.

**2. 2015 Claims for Breach of Contract and Declaratory Judgment**

{¶52} A careful review of the record, however, shows that summary judgment in favor of Cincinnati on the 2015 breach of contract and declaratory judgment actions was in error.

{**¶53**} Both parties agree that the 2015 loss falls within the rider provision's definition of "collapse." As such, Intergroup would be entitled to payment of its claim if the collapse was caused by decay that was hidden from view and could not reasonably be discovered. Pursuant to the rider, Intergroup would also be entitled to payment if the collapse was caused by the

> [u]se of defective material or methods in construction, remodeling, or renovation if the collapse occurs during the course of the construction, remodeling, or renovation. However, if the collapse occurs after construction, remodeling, or renovation is complete and is caused in part by a cause of loss listed in (2)(a) through (2)(e) [(which includes hidden rot and decay)] of this Coverage Extension, we will pay for "loss" even if the use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.

{**¶54**} We find that there are outstanding genuine issues of material fact related to coverage under the collapse provisions. First, although Intergroup did not submit its own expert report on the cause of the 2015 collapse, it submitted the deposition testimony of several employees who testified that prior to the collapse, they never saw rot or decay in the areas of the roof structure that collapsed in 2015. One of these employees, Intergroup's maintenance supervisor, Travis Ady, would have been in a position to notice rot and decay in that area because he often repaired areas of the building that needed maintenance. Ady stated that he did not see rot prior to the June 16, 2015 event.

{**¶55**} Further, Hauser's 2015 inspection report and accompanying affidavit only notes the presence of rot in the trusses and roof structure as it appeared after the collapse. At that point, the wooden trusses and roof structure had undergone significant damage

by breaking and falling to the floor, thus exposing the inside of the wooden boards. Hauser gave no opinion on whether the rot and decay would have been visible prior to the collapse or whether Intergroup should have known it existed prior to the collapse.

{¶56} Other testimony submitted with the parties' motions for summary judgment raise factual disagreements as well. For instance, although Jeff Shive, Cincinnati's field claims manager, testified that rot and decay were apparent all over the building when he visited the property in April 2015, for a completely different inspection, he never documented this fact in any manner or made Intergroup aware of his observations. It may be that the presence of rot is more readily apparent to the eye of an insurance claims manager trained to look for such deterioration than it is to factory workers and business professionals. Nonetheless, whether Intergroup was aware, or should have been aware, of rot and decay within the roof structure that collapsed is a question of fact that is appropriate for a jury — who will hear all of the evidence and weigh the credibility of the witnesses to determine what is or is not reasonable under the circumstances. This is not the kind of question that should be resolved on summary judgment when there is credible evidence on both sides that could lead to opposite conclusions.

{¶57} Further, whether the 2014 truss failure caused the 2015 collapse is a genuine question of material fact that remains outstanding. Although the Hauser inspection might imply that the two are somehow causally related, the report only states that the 2015 collapse occurred in the "general area" of the 2014 truss failure. Photos attached to the motions for summary judgment and included in Hauser's report, however,

show that there is some distance in space between the truss involved in the 2014 event and the trusses that completely collapsed during the 2015 event. At this point in the proceedings, no person or engineer has been able to say with any scientific certainty whether the 2014 event caused the 2015 event.

{¶58} And even if the 2014 event could have caused the 2015 collapse, we are left with several more outstanding questions that are not resolved by the present state of the facts. These questions would include whether Intergroup engaged in "constructive, renovation, or remodeling" when it shored up the truss that failed in 2014, whether Intergroup used defective materials or methods of construction to shore up the truss, and whether that failure to use proper materials and/or methods led to the 2015 collapse. Under such circumstances, the rider provisions covering collapse may require payment from Cincinnati.

{¶59} Accordingly, the court erred by granting summary judgment to Cincinnati on Intergroup's 2015 claims, including its claim for bad faith denial of the 2015 claim, which could only follow from a conclusion that there was first a breach of contract.

### 3. Cincinnati's Counterclaims

{¶60} We further find error in the trial court's grant of summary judgment in favor of Cincinnati on its counterclaims for declaratory judgment. Cincinnati's counterclaims do not meet the jurisdictional requirements of the declaratory judgment act set forth in R.C. Chapter 2721, et seq. The essence of Cincinnati's counterclaims simply ask the court to resolve in Cincinnati's favor the factual contentions that arose

from Intergroup's 2014 and 2015 breach of contract claims. Cincinnati does not ask the court to declare the rights, status, obligations, or other legal relations between the parties with respect to the insurance contract. *See* R.C. 2721.02(A). Further, the declarations that Cincinnati seeks in its counterclaims are dependent on the resolution of genuine issues of material fact that are still outstanding at this time. Accordingly, the court's award of summary judgment on Cincinnati's counterclaims was not proper. We reverse and remand to the trial court to dismiss the claims or, in its discretion, consider a motion to amend.

### 4. Motion to Strike

{¶61} Without deciding whether Loc.R. 21 should prevent a party from filing new expert materials at the summary judgment phase without the benefit of timely notice, we find no error in the court's denial of Intergroup's motion to strike.

{¶62} Appellate courts generally grant deference to trial court decisions on motions to strike. *Jones Lang Lasalle Great Lakes Corporate Real Estate, L.L.C.*, 8th Dist. Cuyahoga No. 104157, 2017-Ohio-4066, ¶ 93. We do not find the Hauser reports to be substantially different in content or opinion than his affidavit. The affidavit does not affect the outcome of the 2014 claim and, although it expounds on the findings in the 2015 report, it alone does not resolve the disputed facts relating to the 2015 claim. Accordingly, on remand, Intergroup will have an opportunity to challenge the affidavit in further proceedings and has suffered no harm from its last-minute filing.

**{¶63}** Judgment affirmed in part, reversed in part, and remanded for further proceedings.

It is ordered that appellant and appellee share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, JUDGE

EILEEN A. GALLAGHER, P.J., CONCURS;
TIM McCORMACK, J., CONCURS IN PART AND DISSENTS
IN PART WITH SEPARATE OPINION

TIM McCORMACK, J., CONCURRING IN PART, DISSENTING IN PART:

**{¶64}** I would affirm the determination of the trial court that Cincinnati Insurance Companies was entitled to summary judgment with respect to both the 2014 and 2015 claims.

**{¶65}** The record is sufficiently clear to conclude that summary judgment was appropriate for both the 2014 and 2015 claims. Because the 2015 incident occurred in the same location as the 2014 incident, coverage is precluded because Intergroup International Ltd. knew or should have known of the decay prior to the second incident.

Further, the evidence clearly shows that the wood in the roof buttresses was rotting away in 2014 and 2015. The language of this policy foresaw this form of damage to preclude coverage. In light of this clarity, I would affirm the trial court's determination in full.

{¶66} For these reasons, I respectfully concur in part and dissent in part.